Taíiarereo, 37
The plaintiff, as administrator of the estate of Isaac Dykes, deceased, instituted this suit against the defendants as obligors on three several promissory notes, each for tho sum of §895 50, dated December 8th, 1860, payable respectively in twelve, twenty-four and and thirty-six months after date, drawn to the order of plaintiff as administrator, and stipulating interest at the rate of eight per cent, per annum from maturity until final payment.
He specifies several small amounts to be credited on the notes, and prays judgment for the remainder, principal and interest. These notes were executed for the payment of the price of certain slaves purchased by Mrs. Bridges at the probate sale of the succession of Isaac Dykes, deceased, and, as was heretofore the custom, a mortgage was retained upon the slaves to secure the payment of the sum at which they were *236 purchased. The plaintiff avers the loss of hi's mortgage right by the emancipation of the slaves, and asks against the defendants'a personal judgment.
At the November term of the Court, 1865, the case was assigned for trial at the succeeding April term. In the meanwhile certain parties alleging themselves to be heirs of Isaac Dykes, appeared and prayed to be made parties plaintiffs, averring that they have an interest in the notes sued on, and refer to an act of partition made among the heirs before the parish recorder. The defendants objected to this proceeding, but the Court ordered that due and legal service be made upon the parties as prayed for by the new plaintiffs. The defendants, thereupon, “ with reservation of all rights against the proceedings,” waived citation and the usual delays, and filed an answer. They reserved a bill of exceptions to the ruling of the Court, and refer to the answer, in which they specially deny the capacity and rights set up by the new plaintiffs, as heirs of Isaac Dykes.
We do not deem it important, in the decision of this case, to pass upon the regularity of the proceedings in the District Court, and omit an examination of the bill of exceptions. Judgment was rendered in the Court below in favor of the administrator, and the defendants have appealed. The defence is, that there is a failure of consideration arising from the emancipation of the slaves by the act of the government; that the warranty expressed in the act of sale, referred to in plaintiff’s petition has failed, and that defendants are released from all obligation, to pay the notes sued on. On the part of those seeking to enforce obligations of' this sort, it is contended that the vendor’s warranty does not extend to fortuitous events that happen after the contracts have been entered into; that in regard to such fortuitous events the vendor has nothing todo; that he did not warrant against the acts of the government; and that he cannot be held liable for events, the occurrence of which it cannot be supposed were contemplated by him at the time of the sale. They roly on the maxim, res peril domino.
On the other hand, it is contended that it is not consonant with law and equity, after the loss by the act of the government, of the property which was the object of the contract, that the obligor should be required to pay for that property, the right to which would equally have been lost-by the obligee had it remained his; that the maxim, res peril domino applies only to cases where the thing which was the object of the contract perishes in the ordinary course of nature, or by fortuitous events beyond the control of man, and which are produoed by mere physical agency. That in the case of the emancipation of slaves by authority of the government the object of the contract does not perish, but that its status or condition is changed. That the law, making this change of condition, having ceased to secure to the buyer the rights he acquired by the purchase, no longer requires him to comply with his obligation to give the equivalent stipulated for those rights.
This important question has given a wide range for discussion. The subj ects of warranty and eviction have been thoroughly examined by counsel, and numerous authorities have been introduced from the Roman and the French jurisprudence. But these tend rather to confuse than to enlighten.
*237 They present conflicting opinions, which it is not easy to reconcile, and from them we are unable to deduce satisfactory conclusions. We must resort then for a solution of the question to the equitable rules that govern contracts in general, and apply them with reference to the effect which the laws abolishing slavery have upon contracts, made in regard to the ownership of slaves.
In entering into the consideration of this subject, we will premise, that in our view of tho question, shivery was never, strictly speaking, established in this country by positivo law. Its original introduction upon the continent of America and the adjacent islands was accidental, arising from the boldness and cupidity of the early European adventurers into South America. Its continuance, when thus introduced, was the result of circumstances, and grew out of considerations of expediency. The system of colonizing in America and the West Indies opened the door for the introduction of slavery, and it was instituted by the greed of speculators and fortune hunters, the government from which they emanated, tolerating tho injustice rather than confirming it by positive laws. Its first form on the American continent was that of tho Indian slavery in South America, in the fifteenth century.
The Spaniards, soon after their occupation of portions of that country, subjected the Indian tribes around them to servitude, needing labor in the first instance in their mining operations. Tho savage, from his native state of freedom and his habits of indolence and ease, being plunged suddenly into a condition of abject bondage, sunk under tho fatigue and exhaustion of his ceaseless toils. The raco began rapidly to disappear. Their miserable fate excited tho sympathies of Las Casas, the Spanish philanthropist, who, after strenuous but vain efforts to procure relief for these wretched victims of his countrymen’s violation of right, fell upon the singular expedient of substituting African slavery in place of Indian servitude. The scheme was successful, and the African slave-trade was commenced.
African slavery, having this origin and character, in progress of time, reached the province of Louisiana. That province, when transferred to the United States, retained African slavery by the conditions of the transfer, to the extent only that it was tolerated by the constitution of the United States, and, consequently, it was imbued with that caducity and proneness to extinction, which, from tho genius and spirit of this government, has characterized the condition of slavery in this country ever since the American revolution. The word -slave is not found in tho constitution of tho United States. Neither is the word slavery. It is a well known fact that the framers of that instrument, in constructing it, purposely avoidedthense of either of these words. They expressly terminated at a fixed period the importation of Africans to this country, to bo subjected to slavery. It is a matter of history, that at tho period of tho formation of tho constitution, and for years afterwards, the groat statesmen of the time had prospective emancipation in view, and never entertained the idea of tho perpetuity of slavery. They viewed it as an entailed evil upon the country, which it was their desire to be rid of as soon as that object could be effected by a safe and practicable emancipation. It was reserved for a later if not a wiser school of politicians in *238 tliis country, to perceive the blessings of slavery, to discover'its divine ordination, and to adopt measures to perpetuate it, pending which, it came to a speedy and final termination. Among the barbarous nations of antiquity, captivos in war were subject to death or slavery at the will of the conqueror. This was the prevailing rule. It was acted upon, and recognized among uncivilized men as a right belonging to the victor, and became the basis of slavery among them. This doctrine was asserted by Ariovistus, a king of ancient Germany, in his conference with Julius Caesar, touching the political condition of certain tribes of Gaul, which the former had subdued. “Ad hsec, Ariovistus, respondit: “Jus esse belli, ut, qui vicissent, iis, quos vicissent, quemadmodum vellent, imperarent: itemPopulum Romanum victis non ad alterius prcosoriptum, sed ad suurn arbitrium, imperare consuesse. ” Caesar’s Commentaries De Bellico Gallico, Book 1st, chapter 36. Slavery, under the Roman government, had undoubtedly its origin in this principle, and according to this recognized rule. But five centuries after the days of Ariovistus, when the softening influences of Christianity began to prevail, Justinian conceded that slavery existed in violation of natural right. He said: ‘ ‘Bella etenim orta sunt et captivitates secutas, et servitutes, quae sunt naturali jure contrarias: jure enim naturali omnes homines ab initio, liberi nascebantur. L. I., T. II.
“Servitus autem est constitutio juris gentium, qua quis dominio alieno contra natnram subjicitur.” L. I., T. III.
In the barbarous ages of the world, when Pagan doctrines and Pagan thought predominated, slavery existed upon the principle that might makes right. Upon the dawning of better days, when civilization and Christianity appeared, the unreasonable dogma failed, and the moral conscience of men no longer permitted them to sustain slavery as a thing of right, and to justify its prolongation, they resorted to the plea of expediency. Such, we infer, has been the unstable foundation of the institution among Christian people ever since the time of Justinian. That it existed in this country without the positive authority or sanction of the paramount organic law of this nation, is indisputable. It was simply permitted at the time of the formation of the government, because it was a peculiar evil that could not, with propriety, be suddenly abated. Its existence was only suspensive, and under the implied understanding that it was to be temporary. The laws, therefore, which existed until recently irpon our statute books, on the subject of African slavery, were merely regulations in regard to that relation which existed only by the will of the sovereign power. Shall we, then, announce that the emancipating act of that power is violative of law, and thence deduce the immunity of the seller from loss, and fix it upon the buyer ? Shall we say that the seller has been deprived of vested rights by the mere arbitrary will or caprice of that power, when those rights, such as they were, never existed otherwise than by its mere sufferance ?
Freedom, it has been properly held, was a preexisting right; slavery, a violation of that right. Titles to slaves would, therefore, seem to be vitiated ab initio.
With these preliminary views of the character of the slavery that lately existed among us, we.shall proceed to consider the effects of emancipation *239 upon contracts arising from the traffic in slaves. When contracts of that character were entered into they had the sanction of law. They might then be judicially enforced. These conditions were necessary to constitute the sale of a slave a valid contract. Under these conditions the vendor and the vendee contracted; the one that he would pay the price stipulated; the other, that the purchaser should have the labor and services of the slave during his life. The sanction of the law and its authority to enforce both these reciprocal undertakings, being necessary to constitute them a valid eontaact, it follows that, when these essential requisites to a perfect obligation ceased to exist, the contract ceased also. True, the vendor complied with his part of the agreement by transfer of the title and delivery of the slave; but surely the vendee’s consent was given under the assurance that he was to be maintained in the possession of the slave, and to receive his labor and services during life. To force him to a compliance with his part of the contract, would, therefore, be to compel him to fulfil a condition to which he never assented. The sovereign power, the paramount law, puts an end to the ownership. The effect of the act which terminates the owner’s right to the slave is not limited merely to that result. It necessarily involves the entire contract, and annuls it throughout. A mortgage of the slave, to secure the payment of the price at which he was purchased, is part of the same transaction. It is a contract made in aid of, and to fulfil an important condition of the contract of sale.
That the mortgage becomes extinct by emancipation is clear. It is evident, then, that the contract of mortgage is annulled by the same cause. If an important item in the agreement by which the vendor consented to sell, and without which, perhaps, he would not have sold, is rendered void, does not the annulment of the mortgage make a damaging inroad into the coutract of sale ? If so, shall we say that emancipation destroyed the contract of mortgage in its entirety, and destroyed the contract of sale only in part ? This we think not tenable. The contract by which ownership existed is inevitably demolished, and with it all its surroundings. The prohibition against the enactment of laws impairing the obligations of contracts has no application to the sovereign power. It gives vitality and force to the laws which regulate contracts. But the power and efficacy extended to these laws are granted, and exist only by the will of the sovereign. When, therefore, the sovereign will of this nation declared that African slavery should no longer exist within its borders, an unavoidable result was, that the laws which had theretofore sustained the institution of slavery and given their sanction to and enforced contracts, the objects of which were the sale of slaves, ceased to exist.
We do not consider the position maintainable, that the effect of emancipation was merely to produce a change in the status of the slave, and not to render void contracts relating to slaves. The status of the slave could only be changed by annulling the law that gave him that status. Emancipation, and the existence of laws upholding slavery, are incompatible. They cannot exist together. But it was the law which sanctioned and enforced slave contracts that established the status. Slavery existed in this country by no other law. Is that law now in force ? If so, the *240 former slave-owner may assert Ms right to the services and labor of the person whom that law once made his slave. If not in force, how can .it be invoked to enforce contracts made in j relation to slaves ? The declaration of emancipation was, in substance, a declaration annulling the laws that sanctioned the dealing in slaves, the enforcement of slave contracts, and, which in fact, created the status of slavery. The fiat of the sovereign is potent to release the contracting parties, as well as potent to sot the bondman free. Its sweep is general, and its wisdom does justice to all. With the ownership perished the obligation to pay the price which was the consideration stipulated for that ownership. The buyer is no longer bound to pay the consideration. The seller is no longer bound in warranty. Thebuyer, the seller, and tho bought and sold, are all absolved. The action of the supreme law leaves the courts without power to enforce obligations of the kind sued upon in this case.
It is therefore ordered, adjudged and decreed, that tho judgment of the District Court be annulled, avoided and reversed.
It is further ordered and decreed, that judgment be and is hereby rendered in favor of tho defendants, releasing them from tho obligations sued upon, tho plaintiff and appellee paying .costs in both courts.
Justices Latsauve and Insnsr dissenting.
Hyman, C. J.
Plaintiff sold defendant certain slaves, and now sues Mm to recover their price.
Plaintiff warranted defendant against eviction of tlio slaves by any right existing previous to tho sale. See Civil Code, 2478.
The right of tho sovereign to evict tho subject of his property is not to be disputed.
This right existed before the sale of the slaves, and has since been enforced.
Although the amendment of the constitution, emancipating slaves, did, by the effects of its provisions, destroy, in some instances, liens granted to secure tho enforcement of contracts relative to slaves, tho conclusion is not rational that therefore it destroyed the obligations of tho parties to such contracts.
The language of the amendment does not show such intendment, and we are not to disregard its words, to find intention different from tho words.
I do not find from the words of the amendment that the sovereign designed and intended the extraordinary deed of destroying valid contracts.
The amendment only freed tho servant from his, master, and destroyed liens granted on him; it did not change or destroy tho master’s obligations, under his contract.
Plaintiff, in my opinion, would be entitled to recover if there was no warranty in tho sale.
Without admitting Judge Taliaferro’s premises, I concur in and adopt the decree written by him as the judgment of this Court.
*241 Howell, J.
Slavery, being the violation of natural right, and sustained only by the constantly operating power of the government, founded upon the popular will, when that power was withdrawn and reversed in its operation, equally by the popular will, all legislation touching slavery became void. Property in slaves being prohibited, all contracts based lipón such property are, necessarily, stricken with nullity.
Courts, which act only upon and under the law, cannot give vitality to laws which have become not merely inoperative, but in conflict with constitutional provisions.
To enforce such contracts would be to recognize the consideration as valid.
The Civil Code is a collection of statutory laws, adopted under and deriving authority from the fundamental law, and its rules on the subject of sale relate and apply only to what is property, and cannot bo applied to what that fundamental law declares is not and shall not be property.
The right of the people, in their sovereign capacity, to abolish and prohibit slavery, and as a logical as well as legitimate consequence, destroy all legal rights growing out of the institution, is unquestioned and unquestionable. All parties to such contracts are left as they were when such a fundemental change was effected, and stand as if no such property ever existed; all rights, privileges and obligations, growing out of or incident to the ownership of such property, are extinguished. The seller cannot enforce the payment of the price, nor the buyer the obligations of warranty. Each of the parties is equally participant, and consenting in the abolition and prohibition of slavery. One cannot, in equity, retain and exercise his rights, while the other is divested of all rights. The action of the people in their sovereign capacity, is equal, uniform and universal; and, in its effect, is paramount to the ordinary rules regulating private rights.
This is not a case in which the thing has perished, but the right of property in all slaves is forbidden by the supreme law and public policy, and no obligation exists. That which is forbidden is impossible and void. Civil Code 1757, 1885, 1886. The fact that the contract was made prior to the prohibition, and was then legal, does not relieve it from the effect pf the prohibition,
If it be forbidden by public policy and the sovereign will, to make .a contract, it is equally forbidden to enforce such a contract, whenever made. Eor these reasons I concur in the conclusions of Mr. Justice Taliaferro, whose views, as expressed by him, command my concurrence.